May it please the court. I know I'm on my own. I'm stating an aspiration to reserve five minutes for rebuttal, but I have the clock in front of me and I will struggle with you to do that. This appeal presents two issues. Prosecutorial misconduct that ran from opening statement through rebuttal closing, and a complete failure to establish the materiality of hypothetical non-cash option quote expenses that were omitted from Brocade's financial statement. I'd like to address them both, but I'd like to start with the materiality point both because it requires acquittal and because this is such an unusual sufficiency case. It's very important to understand the real materiality question in this case. The legal standard under BASIC is whether a reasonable investor would think that particular information would have significantly altered the total mix of what was otherwise available. In this case, Brocade's financial statements already disclosed all sorts of information about stock options, including particularly disclosures under FAS 123 that the company had more than $1.5 billion in these hypothetical non-cash option expenses, and it went beyond that and included tables spelling out how those expenses would turn profits into losses if they were taken into account. So what the prosecution... Mr. Reichen, I just want to be sure I understand correctly. Are you asserting that the company complied with ABP 25 in expensing, and I'm going to use the term backdated, between the strike price value versus at the time of the entry, did they follow ABP 25? No. We are conceding that the prosecution proved, we denied it, but the prosecution proved that as APB 25 came to be understood, they were not reporting the value that APB 25 requires to be reported. And can you give me some idea, when you aggregate all of the options to non-officers, officers, and the whole crew during the relevant time period, what are we talking about? Had ABP, or APB rather, 25 been applied, how much would the earnings of the company have been reduced? How many millions of dollars? The government proved that over the five-year period at issue in the case, the total earnings would have been reduced by this hypothetical expenses, I think, by $950 million. Okay, $950 million. And what are the total earnings of the company, the profits during that time period? I don't actually have them in mind. If they had been included, they would have reduced, they would have turned some years in which the company showed a small profit into a loss, and they would have increased the losses that were otherwise shown. I'm just trying to get an idea of the magnitude is all. Can you give me some range? The relevant proxy statements are all, probably to your dismay, in the record excerpts. And let me just see if I can find the, the relevant numbers for 2003 are in volume 11 of the record excerpts. And you can see that if you, it reports 2003, 2002. What page, Mr. Rackney? Page 2528 is the income statement. That's page 48 of the exhibit. And what did that say? What it shows is for 2002, it shows a net loss of $136 million. Okay, so if you look at, if you took, if you took, and again, we're just dealing with hypotheticals because I'm trying to get the materiality issue here. If you take $136 million loss and you divide the $950 million over the five-year period, you can see that we're talking about a really significant change in the earnings of the company had it followed APB 25. And I gather your argument is based upon the academic study that was done that the investors should not have cared about it. On the other hand, there were witnesses, including Bowie McCormick and two Brocade investors, who said they were very much interested in it and they cared a lot about it. Okay, so let me. How do we deal with that? Let me just make sure that I set the table here for exactly what our argument is. There's no doubt that a billion dollars is a big number, and we don't dispute that as a general matter, investors who are thinking about buying or selling their shares, which is the relevant pool here, care about a company's earnings. The point here is that we're talking about a very unique kind of earnings, that is earning an expense that will never be an expense to the company. It will never have a cash expense effect, except insofar as any of those options are ever exercised. It will produce cash for the company. That's number one. But with respect, Mr. Waxman, what you're saying is that the folks who did APB 25 shouldn't have done it. And, of course, later on it did get changed. But that was, in fact, the rule at the time, right? Yeah. Whether it was wise or not. Right, but whether it was wise. I mean, the FASB requires all sorts of things to be reported in GAAP for a whole variety of reasons. And just because something is material for GAAP purposes doesn't mean that it is material to a reasonable investor such that it alters the total mix of information already available to that investor. And our principal point here is that these financial statements disclose that the company, over this period, had hypothetical stock option expenses not just of a billion, but a billion and a half dollars. And it also includes a pro forma statement on page 60 of the, which is ER 2530, which shows the effect on income of loss of those FASB 123 losses. And this in the context of the government's own witnesses who testified that the FASB 123 numbers were more useful for investors and that putting the APB 25 lines into the income statement simply obscured true performance. Now, in light of that. But the government's expert testified that the APB 25 calculations affected the reported earnings, which unlike the FASB 123 disclosures. You mean Mr. Fujimoto? Mr. Fujimoto. We don't have any, I mean I do have a quarrel, but for purposes of the appeal, we don't have any quarrel with Mr. Fujimoto's calculations. And there's no doubt that if APB 25 numbers had been reported, it would have been on page 48. And unlike the FASB 123 numbers, which are on, I believe, page 60. Our point is, given how unlikely it is, both as a theoretical matter and in light of their own witnesses' testimony, Mr. Duranlo and Ms. Bui, that the FAS numbers, A, are more accurate and more likely to reflect what investors care about, and B, that this company itself, their CFO said, that this company produced these pro forma numbers stripping out these meaningless expenses, specifically because including them obscured the true performance of the company. Now, I'm not making purely as a matter of law argument that the failure to include APB 25 calculations in light of the FASB calculations means that as a matter of law. You're not saying that the APB calculations are inaccurate either, are you? We're not contesting that for purposes of the appeal. Nor are you saying that those numbers would not have informed a prudent investor of information that he or she might have used. I'm saying that the government has now had two trials in which they have had an opportunity to produce a witness, any witness, who would say that they understood the difference between cash and non-cash expenses. Is that relevant? I mean, really. I mean, we're talking about the reasonable investor. 10B, 10B-5, all those statutes and regulations were designed to protect the average investor. And I suspect, particularly in light of what's happened in recent times in the market, that the average investor hasn't got a clue how to read any financial statement, let alone a sophisticated statement about options. But the government put on some testimony about witnesses who said that the fact that these losses, albeit under ABP-25, made a difference. It was important to them. And I don't think that you all refuted it other than having the academic, and I've forgotten the gentleman's name, come on and say that they shouldn't have cared. Was there contrary evidence that was put on? We didn't. The defense didn't put on a case. We did have. This was contested for purposes of sentencing. No, the jury could have believed that. Let's talk about the four witnesses the prosecution called. The prosecution called two proxy advisors. They were not qualified as experts. They made clear that they had no role and no information with respect to buy and sell decisions. Their testimony as to materiality was irrelevant as a matter of law, which is why Judge Breyer ignored it in denying our post-trial motion. So their case really comes down to the two investor witnesses. Their testimony, unlike the 200 pages of proxy witness testimony, is very short. It's in Volume 9 of the record excerpts. And I urge the Court to read their testimony. What page? Volume 9. They testified in order, one after the other. And Mr. Kilgannon's testimony begins on page 1906. Neither of these witnesses testified that they ever looked at Brocade's or any other company's 10-Ks. They testified, they didn't even testify that they understood the difference between cash and non-cash expenses. They testified that when they did look at any numbers for Brocade, they were looking at analyst reports and they had no idea whether they were cash or non-cash numbers. And Mr. Ryan, who was the professional investor, testified that he was a technical trader who paid no attention to the fundamentals. He traded purely based on price and volume. He testified that he understood, he expected, that the market would fully evaluate everything in the financial statements, which includes the pro forma FAS 123 numbers, which FAS requires are an integral part of the financial statements, and factor that into the price of the stock. So you're saying that when you aggregate the testimony of these several witnesses, there's a failure of proof. Yes. They probably did not address the issue of what the difference would have been. They had to put on some proof in light of the fact that these are hypothetical non-cash expenses. They had to put on some proof that these non-cash expenses mattered to any investor, any reasonable investor. Let me ask you this, Mr. Waxman. You know, Warren Buffett and a whole bunch of people were really angry about this and Babst and all those other things happened after that time. They felt it really did not reflect the reality of what's going on. Big fight, everything's going on. Are we, as appellate judges, permitted to consider, if you will, by taking judicial notice of how FAS 123 came about or APB 25 came about, any of that? I mean, the reasonable investor is, you know, like the reasonable man or reasonable person these days to a jury, is it not? Do we need to have this testimony? Is that essential for us to determine materiality? Yes. The government has to satisfy Basic versus Levinson that for a reasonable investor in making a buy-sell decision, including the APB 25 numbers when you already had the much larger FAS 123 numbers and a pro forma showing the results, they had to come up with someone who would say, I'm an investor or I'm an expert. No experts testified in this case. I'm an investor and I do pay attention to this and this does matter. And they particularly, Judge Smith, had to do that. You don't have to take judicial notice of this. Their witnesses testified about this. Mr. Durandlo, their CFO, testified that the non-GAAP numbers, that is a pro forma, were required in order to discern, quote, how the business is actually performing and that the GAAP figures were, quote, unhelpful to investors and the investment community and obscured the company's true performance. In light of that, they had to produce somebody who would say, this altered the total, this would have altered the total mix and I'm reasonable. And the fact is, I mean, the government put out an ad in the Wall Street Journal asking before the first trial for anybody who thought that they had been harmed as a result of this. And that is in the record of the first trial. And what they, in the first trial they had no investors. In the second trial they had the two that I mentioned and I just urge the Court to read their testimony to see whether, in light of the FAS 123 requirements, they satisfied their burden. But even if I'm wrong about this, and I see that I'm eating into my aspirational time, so I'll just, I guess, conclude with this, that is the core issue on materiality and it's why the prosecution's proof was insufficient in this case as a matter of law. But it's, it is also why it was so wrong and so very damaging for the prosecution to stand up in rebuttal closing and tell the jury that because Brocade had issued a gap restatement, that in assessing materiality, the jury could just ignore the whole FAS 123 issue, quote, period. And it told the jury, if you want, you can stop right there. That proposition, that the jury could not, you know, could avoid having to wrestle with this difficult and technical sufficiency argument, was simple, it was powerful, it was seductive, and it was utterly false and the prosecution knew it. And that is. I follow. You're with me on simple, powerful, and seductive. But I don't know how it was false. It was. Our, look, our argument was under BASIC, in determining materiality and whether the government satisfied its burden to prove materiality, you've got to take into account two things. One, the fact that these are non-cash expenses, and two, the fact that a much larger number of expenses were disclosed year after year. And you have to determine whether the fact that the AP, the lower APB 25 numbers was not also disclosed, was significantly altered the total mix to investors beyond a reasonable doubt. And the prosecutor got up in rebuttal closing and said, with respect to their materiality argument, the jury, quote, really doesn't need to wade into FAS 123 argument at all, and that because Brocade did a restatement, the jury could simply, quote, know that Brocade's FAS 123 disclosures were irrelevant, period. Quote, if you wanted to, you could leave it right there. That was, and that is what made it false, because our whole argument was, in light of the fact that we disclosed a billion and a half dollars using a method that superseded APB 25 at the very end of the conspiracy period here, and that their own witnesses testified was more relevant to investors, they had to find that this delta was, would significantly have altered the mix. I don't know whether that's so much false or just inconsistent with the defense argument. That's what I'm sort of struggling with. Because, you know, the investors are all going to be concerned with earnings, and as I understand it, that was supposed to have been reflected in the APB 25 non-cash expenses. So, you know, you have a theory that's palatable, but it's just inconsistent with what the government argued, but that doesn't make it false. No, no, no, no. Let me be clear about this. There's nothing wrong. In our adversarial system, we expect the government to controvert the defense's theories and evidence. That's not what's wrong here. What's wrong here is that because our materiality argument was, look, these are non-cash, and we already, using FAS 123, disclosed very prominently in all our financial statements the effect on income and loss of a billion and a half dollars of these hypothetical expenses. You need to find, beyond a reasonable doubt, that the fact that using a less efficient, discarded statement would have, quote, significantly altered the total mix available. And the prosecution didn't respond on the merits. When it was too late for us to get up, he got up and said, all you need to know is there was a restatement, and you can stop right there. That was misconduct, and it was prejudicial precisely because the government's case, at best, on materiality was wafer-thin. I'd like to reserve all 22 seconds. All 23 seconds. All right. We may give you some more time. All right. Is it Rosen? Rosen. Rosen. I apologize. Thank you, Your Honor. May it please the Court, Amber Rosen for the United States in this matter. Let me start with the materiality issue. In terms of the magnitude of the, to the extent that defendant caused brocade to overstate his earnings, that's all in the government's brief at the very bottom of page 17 and the top of page 18. Is Mr. Waxman correct about this point? I mean, to me, it's kind of a race of soloquitur thing in terms of the magnitude. There's a whole lot of dollars involved, and it really does affect the earnings. But on the other hand, this is a criminal case. Yes. The government has the obligation to prove each and every element of the alleged offense beyond a reasonable doubt. Mr. Waxman has argued that the four witnesses, and I'm going to go back and look carefully at the record again on this. He argues that none of these people identified the missing dollars as a result of APB 25, what would have been APB 25 treatment. Indeed, they don't even look at the financial statement. Under the circumstances, is he correct that there has been a failure of proof on that element of these charges? Absolutely not. Okay. Why is that? Two of the witnesses, which he didn't discuss, were Ms. Bowie and Mr. McCormick. He mentioned them, but you may view their testimony differently. Correct. I do view it differently. He's saying that they weren't qualified to testify about what investors care about because they did not actually advise investors on the buying and selling decision. But they were both professionals whose job it was to advise institutional investors. They did it with respect to proxy voting decisions, but their whole job was to advise institutional investors, and they certainly had, therefore, personal and professional knowledge about what investors care about. Can they, in effect, be proxy investors, if you will? Because, of course, like 10B, you've got to, by omitting to state or falsely stating a material fact that would lead someone to buy or sell a security. In this case, you're saying that Bowie and McCormick, if I understand you correctly, they professionally advise people who do buy, and they do look at this, and they think it's important. Is that sufficient to, if you will, view them the proxy for the investor as filling the requirement of the statute or the regulation? Well, I think the government proved materiality in a number of ways, and the ways in which Bowie and McCormick's testimony was relevant is that they provided information to the jurors about what investors care about. The fact that they're advising... How do they know? Because their whole job is to advise institutional investors. The fact that they're advising them specifically with respect to their proxy voting decisions still shows that they know what investors care about, and what they said was... I guess what I'm struggling with is this. Let's just say you and I entered into a stock transaction. You had a company, and I thought, gee, I'd really like to invest with you. And you said, oh, we've got these great things going on, and I've got this app that's going to go on Apple, and it's just going to be great. You're going to make a ton of money. And what you don't tell me is that the president of your company has melanoma, and he's going to die in a month, and you've depended entirely upon him. Now, that would be a really clear case. You've omitted the state of material fact, because you told me, and I relied on that. Whereas in this case, the government is saying, you've got these people who... They're basically investment advisors. They're giving advice to people who do buy. But they didn't rely on it. They didn't look at it. They didn't say anything to these advisors. Is that sufficient? Well, that's not the circumstance that we have. There were two actual investors in Brocade. And they, according to Mr. Waxman, and again, I'm going to check the record, they didn't even look at these financial statements, any of them, any part of them. Is that right? Well, that's why you need to look at it all cumulatively. The court looks at whether the evidence was sufficient and takes a cumulative view of the evidence and should not look at each piece and pull it apart. Forgive me, I hate to interrupt you, but we don't have a whole lot of time. In the evidence in the aggregate, is there any testimony by Mr. Bowie, Mr. McCormick, or the other two investors that said, I looked at these financial statements and I bought or I sold stock of the company based upon X. And it turned out that it was Y. Did anybody say that? No, but that's not what's required. And, in fact, there were no investors in the first Reyes case, and this court in that case specifically found the evidence material. So what we've had in this case was, one, that the expenses of the company, as we've already discussed, were grossly overstated. You had two investors who said, I cared about the earnings, I followed the earnings. When I heard that Brocade had to restate its earnings, I immediately sold a substantial share of my stock. So you're saying that these two investors said that they did care about the earnings and they did check them, is that right? Yes, they did testify to that, absolutely. Then we also had the two institutional. Let me make sure that I'm clear then. So we have kind of macro and micro. We have some investors who said, we care about the earnings and we make our investment decisions based in part on what a company's earnings are. Correct. So what we don't care about or what we don't look at is how you determine what those earnings may be. So we may not look at the APB 25, but we are going to care about what the earnings are and the things that may reflect what those earnings are. Is that, in effect, what you're arguing? Well, that's a piece of it. The investors testified that they did follow the earnings. That was a significant information to them and that they sold when they learned that Brocade had misstated its earnings. When Brocade admitted that it was stock-based compensation expenses that were being failed to be reported and that they were non-cash, they still sold. After there was a restatement. Well, that was on the press release by Brocade, that the reason they were going to need to restate was based on their failure to report stock-based compensation and that they were non-cash expenses. That was in the press releases that the investors said they read and was, in part, why they sold. In addition to that, Bowie and McCormick both testified that investors do care about in-the-money stock option grants to employees. They do care about the equity that employees is getting because it misaligns the interest between the public shareholders and the employees and because it affects the value of their shares because when options are being given to employees in-the-money options, it dilutes their value. Did they testify that either they bought or sold the stock or that they advised anybody else to buy or sell the stock? No, but they did testify that they advised the investors as to how to vote their proxy shares and they were testifying to give the jury information about, in general, what investors care about. So, in effect, and I'm probably overstating this, but Mr. Reyes put on, I forget the name of the expert who testified that the investors shouldn't care. You put on to say that they do care. Are they substantially equivalent there? In effect, they're not in the real world. They're out there and they all have their opinions, but they're not dealing with an actual transaction. No, and, in fact, the defense put on no witness like that at testimony. He's arguing that in the appellate brief, but there was no expert at trial. And the fact is the jury heard all of this evidence and heard all of the defense arguments and found it material. In addition, the argument that because the financial statements disclose the FAS 123 disclosures says nothing about this because, as the witnesses testified, the FAS 123 disclosures doesn't affect the bottom line, the bottom line earnings of the company, as does the APB 25. And, moreover, three witnesses, Miyoto, Fujimori, and Bowie, all testified that because the APB compensation expenses were wrong, the FAS 123 disclosures were wrong. So, in any event, this information was not disclosed to the investors. And the fact is, and I think we can't get away from the fact, that Brocade failed, overstated its expense, I'm sorry, overstated its earnings by $1 billion over five years. There's really nothing more. Can the materiality element of the alleged crimes be satisfied beyond a reasonable doubt if you eliminate the testimony of those four people? Just by looking at the financials on their own and relying on what the jury's instructions say. Yes. And, in fact, this Court in Reyes said and quoted the SEC versus Murphy decision that basically the gross overstatement of earnings is in itself sufficient to establish materiality. And the Court found basically based on the overstatement of earnings and McCormick's testimony, there was a little bit more in the first trial. But basically based just on those two things, the Court found it material in this particular case. So there really is no basis for upsetting the jury's finding here that there was evidence of materiality. Does the Court have any questions regarding any of the other issues? I have no questions. Yes. I'm sorry? You said you didn't have any questions. Oh, no questions. On that, I will submit it there. Thank you. Okay. Thank you. Mr. Waxman, we'll give you a couple of minutes to respond. Thank you. Mr. Waxman, just a quick question from a district judge's perspective. Did the defense have an opportunity to cross-examine these four witnesses? Absolutely. And Mr. Neal availed himself of that. Right. And it dawns on me that if you had the opportunity to cross-examine those four witnesses and put before this jury how, you know, the reasonable investor would not rely on what these witnesses testified to, then why should we disturb that jury's verdict? Because obviously they had enough information before them to make a decision. Well, the question, I mean, of course, sufficiency issues come up on appeal when there's been, only when there's been a conviction. So the fact that the jury found the materiality element satisfied, it doesn't address, doesn't absolve this Court from seeing whether as a matter of law on these facts it was sufficient. It also, the jury also may very well have heeded what Mr. Reeves said in his rebuttal closing, which is you don't need to think about the pro forma income statement that's on page 160. All you need to know is there's a restatement, and that takes care of the materiality issue. And in fact, what Ms. Rossin said, that you, all you need to do is to, if you had applied ABB 25, this is what the difference would have been. Ifso, facto, materiality is met. You look at the jury instruction, which, of course, allows the jurors to make the determination of what a reasonable person would do. You don't even need to look at the testimony of the four folks. There is no way, with respect, Your Honor, that the, that these, that ABB 25 omissions were material as a matter of law, even if they didn't call any of their four witnesses. They are, we think, for reasons we've explained in our brief, immaterial as a matter of law. But I acknowledge. How do you address her point that in the, I'll call it Raya's one opinion. Yes. Our distinguished colleagues concluded there was no problem with materiality based on the over, gross understatement, if you will, of the. Well, what the, that was, the Court was addressing factual sufficiency based on a record that had only one, there were four witnesses here, only one of them testified in the first trial. We didn't make the argument that we're making now about the incremental effect of the FAS 123 disclosures. That wasn't before the Court. And the Court actually, with respect, made a very significant error. And it goes to some of Ms. Rosen's points. It could, it under, it misunderstood that Mr. McCormick. Somebody once said that. I'm going to say it again. Okay. And I don't think there's any dispute about this. It character, it understood Mr. Catrix and Mr. McCormick, the two materiality witnesses in the last trial, as having testified as experts and that their expertise was not questioned by the defense. In fact, they were not qualified as experts. They were fact witnesses, just as, and this goes to the, the first set of questions you were asking Ms. Rosen, Judge Smith, the issue of the proxy witnesses. These proxy witnesses, Bowie and McCormick, were not qualified as experts. They testified as fact witnesses, as people who advised big institutional shareholders how to vote on proxy decisions, like should we approve the renomination of Mr. Dempsey to be on the, the compensation committee, and is he a good steward of the company? The materiality question here, and the jury was instructed about this, relates to buy-sell decisions. These people were not experts. They had not bought and sold stocks.  And the prosecution in, in colloquy with the court, but not in front of the jury, acknowledged that there were lots of things that may be material for somebody who owns stock, particularly a big institution, as to whether they're going to vote for Neal Dempsey or not, that would not be material with respect to buying or selling stock. And our, so you're, you, you're in effect going back to the, the question that I raised, which is, if these folks didn't really advise somebody in the buying or selling of the stock, and the other two people didn't make a decision based upon that, that they don't meet, in effect, as fact witnesses, they don't corroborate the government's case on materiality. That's right. And get back to the issue of whether or not the misstatement of the earnings alone is sufficient. That's right. And, you know, in fact, if you look back at the first trial, Mr. Catrix, who's one of the witnesses that the prior panel mischaracterized as an expert, he was an investment advisor. His job was to advise clients on the purchase or sale of stock. They didn't have any such person this time. I just want to mention one last thing, because I know we're going on some time. I would love to keep going on, but I'm mindful of the time. This would help you on the 10B issues, maybe on some of the others, but it really doesn't help you on the 10Q, 10K annual report statements to the accountants, does it? Because it had nothing to do with buying and selling then. These are just direct statements by Mr. Reyes that, according to the government's testimony, were just flat-out false. No, with respect, Your Honor, it doesn't go to count eight, which is a books and records count that I'd like to address in a minute, well, with the Court's indulgence. But as to each and every one of the other counts, the jury was instructed, and the parties agreed, even with respect to the false statements to the accountants, that it not only had to be material to the accountants, but it also had to be material to an investor in a buy-sell decision. So you're saying, your argument is that the same materiality questions that we're talking about under 10B and other subsidiary buy-sell issues also apply to the other issues other than the record issue, right? Yes. And the Court's instructions are absolutely pellucid about that. And Your Honor was quite right in making the point earlier that one can think of securities cases, civil or criminal, that don't involve, you know, buy-sell decisions. That's not what was charged in this case. It's not what was instructed in this case. And as to that, the government's evidence was insufficient. Well, we thank you both for your fine arguments. I assure you that the Court will work very hard to try to get this right. It is a very complex and interesting case. And we thank you both for your fine arguments and the case of United States v. Reyes is submitted. Thank you, Your Honor. The Court is adjourned for the day.
judges: Marbley, Gould, Smith M.